**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHAD POIRIER, as the duly appointed administrator of THE ESTATE OF O.P., an infant, | CASE NO. 8:25-CV-0339 (AMN/PJE) |
| Plaintiff, | **VERIFIED COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| CHAZY RURAL SCHOOL DISTRICT, BOARD OF EDUCATION OF CHAZY RURAL SCHOOL DISTRICT, CLINTON-ESSEX-WARREN WASHINGTON BOCES, CHAZY UNION FREE SCHOOL DISTRICT, BOARD OF EDUCATION OF CHAZY UNION FREE SCHOOL DISTRICT, ROBERT MCAULIFFE and STANLEY MAZIEJKA. | |
| Defendants. | |

Plaintiff Chad Poirier, as the duly appointed administrator of the Estate of O.P. by and through his attorneys Eric Rosenberg of Rosenberg & Ball Co. LPA, Kimberly C. Lau of Offit Kurman, P.A., and John Bailey of Bailey, Johnson & Peck PC, file suit as follows against Chazy Central Rural School District (CCRS), Board of Education of CCRS (CCRS School Board), Clinton-Essex-Warren-Washington BOCES[1] aka Champlain Valley Education Services (CEWW), Chazy Union Free School District (Chazy Union SD), Board of Education of Chazy Union School District (Chazy Union BOE), CCRS Superintendent Robert McAuliffe (McAuliffe) and former CCRS Interim Superintendent Stan Maziejka (Maziejka), and allege as follows:[2]

---

[1]BOCES is an acronym for Board of Cooperative Educational Services. BOCES is a public organization created by the New York State Legislature in 1948 to provide shared educational programs and services to school districts.

[2]Defendants CCRS, CCRS School Board, Chazy Union SD, Chazy Union BOE, CEWW and McAuliffe are collectively referred to as "School District defendants." Defendant Maziejka is referred to as "Maziejka" School District defendants and Maziejka are collectively referred to as "defendants."

## THE NATURE OF THE CASE

1.      School districts and its officials are entrusted with the responsibility of following federal and state regulations and policies in a fair and unbiased manner without discriminatory intent. This case is brought under 42 U.S.C. § 1681, et seq. (Title IX), 42 U.S.C. § 1983, the Fourteenth Amendment of the United States Constitution, New York Estate Powers & Trusts Law § 5-4.1, and New York common law. This action seeks damages for defendants' gender-based motivation and bias in investigating charges and imposing disciplinary action against O.P., a then 15-year-old boy.

2.      This case is about the failure of the defendants and their officials to investigate fully and fairly an accusation that resulted in defendants' reckless rush to judgment against O.P. On October 16, 2023, Defendants improperly imposed a sanction of expulsion immediately following a single meeting with O.P. where he first learned of the accusation, vehemently denied any wrongdoing, and tried desperately to defend himself alone.

3.      Defendants failed to properly administer their policies and, acting with anti-male bias, imposed a consequential, life-altering disciplinary sanction on O.P. As a result of defendants' reckless actions, O.P. sustained the most tragic and incomprehensible of damages: O.P. killed himself later that day.

4.      In their rush to judgment, defendants failed to provide O.P. with the due process he was entitled to under Title IX and Chazy Central Rural School District's policies. He and his parents were denied proper notice, denied the opportunity to respond to the allegations in writing, precluded from reviewing exculpatory evidence in the possession, custody and control of Chazy Central Rural School District, denied a fair hearing, and O.P. was unlawfully expelled for an

PAGE 2—VERIFIED COMPLAINT

offense which he did not commit. Put simply, defendants engaged in a process so clearly irregular the process was a "sham."

5.      Further, in response to public pressure to favor an accusing female over the accused male to demonstrate a commitment to protecting female students from sexual misconduct, defendants exhibited a sex-based bias when investigating and disciplining O.P. Defendants also used this sham process—and abused the process—to gain a strategic advantage in the currently pending *Pilon* litigation described below in paragraph 43.

6.      O.P. was targeted by a discriminatory accusation and Defendants expelled him under circumstances that indicated a deliberate indifference to the truth or falsity of the accusation.

7.      Defendants' grievance process was so objectively deficient that it was not aimed at uncovering the truth or respecting O.P.'s due process and equal protection rights. For instance, defendants:

        a.   wrongfully investigated and disciplined O.P. without proper notice;

        b.   denied O.P. the opportunity to review exculpatory evidence in the defendants' possession, custody and control, namely, video footage from the Chazy School District school bus;

        c.   Denied O.P. the opportunity to question the complainant or her witnesses;

        d.   denied O.P. the opportunity to present witnesses in his favor;

        e.   discriminated against O.P. by failing to provide him with equal supportive measures—supportive measures that were provided to the complainant; and

        f.   applied unequal, gender-biased assumptions against O.P., a male student, which impacted defendants' assessment of O.P.'s credibility and reflected a gender-based advocacy in favor of females who accuse males of sexual misconduct.

## THE PARTIES

8.      Plaintiff Chad Poirier was appointed administrator of the Estate of O.P. by the Surrogate's Court of the State of New York, County of Clinton on September 20, 2024.

9.      At all relevant times, O.P. was a natural person and resident of the State of New York, Clinton County. O.P. was born on November 6, 2007, and died October 17, 2023.

10.      At all relevant times, Chad Poirier and Tammy Poirier (collectively the "Poiriers") were the parents and natural guardians of O.P.

11.      Defendant CCRS is a municipal corporation operating as a public school district duly organized and existing under the laws of the State of New York with a principal place of business in Clinton County. At all relevant times, CCRS operated, oversaw and was responsible for the Chazy Central Rural School ("Chazy School") in Chazy, New York. The school district and Chazy School are recipients of federal financial assistance.

12.      Defendant CCRS School Board is a municipal corporation and/or an administrative body organized under the laws of the State of New York and at all relevant times operated, oversaw and was responsible for Chazy Rural Central School. The School Board's principal place of business is in Clinton County at 609 Miner Farm Road, Chazy, New York, 12921. Defendants CCRS and the CCRS School Board approve employment contracts for all employees including administrators, teachers and staff, and are recipients of federal financial assistance.

13.      Defendant Chazy Union SD is a municipal corporation operating as a public school district organized under the laws of the State of New York and is a recipient of federal financial assistance.

14.      Defendant Chazy Union BOE is a municipal corporation and/or an administrative body duly organized and existing under the laws of the State of New York with a principal place

of business in Clinton County and is a recipient of federal financial assistance.

15.    Defendants Chazy Union SD and Chazy Union BOE are both headquartered at 609 Miner Farm Road, Chazy, 12921, Clinton County, New York.

16.    Defendant CEWW is a governmental entity, subdivision and/or administrative body organized and existing under the laws of the State of New York.

17.    Defendants CEWW is headquartered at 1585 Military Turnpike, Plattsburgh, Clinton County, New York.

18.    For purposes of this Complaint defendants CCRS, CCRS BOE, Chazy Union SD, Chazy Union BOE, McAuliffe are referred to collectively as the "School District defendants."

19.    Defendant Stanley "Stan" Maziejka was at all relevant times the Interim Superintendent of CCRS, acting under color of state law when he made the final decision with regard to actions taken against O.P. Maziejka's responsibilities included ensuring that CCRS complied with applicable due process, equal protection laws and faithfully abided by the requirements Title IX of the Educational Amendments of 1972, 20 USC § 1681, *et seq*. Maziejka is named individually and in his official capacity as an agent of CCRS. Maziejka is a resident and citizen of New York.

20.    Defendant Robert McAuliffe is the current Superintendent of the Chazy Central Rural School District. McAuliffe's responsibilities include ensuring that CCRS complies with applicable due process, equal protection laws and faithfully abides by the requirements Title IX of the Educational Amendments of 1972, 20 USC § 1681, *et seq*. McAuliffe is named in his official capacity as current CCRS Superintendent. He is not named in his individual capacity. McAuliffe is a resident and citizen of New York.

## JURISDICTION AND VENUE

21.     This Court has federal subject matter jurisdiction under 28 U.S.C. §1331, 28 U.S.C.

§ 1332, and 28 U.S.C. § 1367 because (i) the case arises under the laws of the United States; and,

(ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681,

*et seq.* and 42 U.S.C. § 1983 are civil rights claims. The amount in controversy exceeds $75,000.

22.     This Court has supplemental jurisdiction under 28 U.S.C. §§ 1367, 2201 and 2202.

23.     Venue rests with this Court pursuant to 28 U.S.C. § 1391(b) because plaintiff's

claims arose in this District.

## CONDITIONS PRECEDENT TO SUIT UNDER
## GENERAL MUNICIPAL LAW § 50-e and EDUCATION LAW § 3813

24.     All conditions precedent to suit have been met. Plaintiff served verified Notices of

Claim on the School District defendants within ninety days of the appointment of the administrator

of O.P.'s estate.

25.     At least thirty days have passed since the service of the Notices and no adjustment

or payment has been made.

26.     The School District defendants requested and conducted a § 50-H hearing on

January 21, 2025.

## RELEVANT REGULATIONS AND POLICIES

### *General Requirements of Title IX*

27.     Title IX prohibits any federally funded education program or activity, such as those

provided by the School District defendants, from discriminating on the basis of sex. The statute

provides that "no person shall, on the basis of sex, be excluded from participation in, be denied the

benefits of, or be subjected to discrimination under any education program or activity receiving

Federal financial assistance." 20 U.S.C. § 1681(a).

PAGE 6—VERIFIED COMPLAINT

28. The United States Department of Education has adopted regulations interpreting Title IX. These regulations are codified at 34 C.F.R. Part 106.

29. 34 C.F.R. § 106.31(b) provides that an education institution ("recipient"):

> shall not on the basis of sex (1) treat one person differently from another in determining whether any such person satisfies any requirement or condition for the provision of such aid, benefit or service; (2) provide different aid, benefits or service or provide aid, benefits or service in a different manner; (3) deny any person any such aid, benefits or service; (4) subject any person to separate or different rules of behavior, sanctions, or other treatment.

30. 34 C.F.R. § 106.44 requires that a recipient follow a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions against a respondent such as O.P. The School District Defendants violated 34 C.F.R. § 106.44 in handling O.P.'s case.

31. 34 C.F.R. § 106.45 defines the minimum requirements of the grievance process that must be followed, including, among other things, providing notice of allegations, investigating impartially, avoiding prejudgment of the facts at issue, and prohibiting bias. The School District Defendants violated 34 C.F.R. § 106.45 in handling O.P.'s case.

32. A school's grievance procedures must include adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and respondent to present evidence and witnesses. The procedures are designed to ensure constitutionally guaranteed due process to both parties involved to ensure sound and supportable outcomes. The School District Defendants did not provide O.P. with these grievance procedures.

//

//

//

*New York Education Law*

33.    New York Education Law dictates the process for disciplining students and establishes the rights and privileges of students accused of misconduct before they are sanctioned with either short-term or a long-term suspension or expulsion.

34.    <u>Short-Term Suspension</u>: Education Law § 3214 provides that a student charged with misconduct and faces a short-term suspension, a parent or guardian must receive notice in writing that the student may be suspended. The notice is to include (i) a description of the misconduct, code or rule violation and the date it occurred; and (ii) information that the student and parents are entitled to an informal conference as well as a right to question the complainant.

      a.  The informal conference must occur before the suspension unless the student's presence at school poses a continuing danger to others or property; and,

      b.  The informal conference is conducted with the student's parents and is an opportunity for the student and parent to question the complainant's account. It also provides an opportunity to discuss alternatives to suspension.

The School District defendants violated Education Law § 3214 in handling O.P.'s case.

35.    <u>Long-Term Suspension</u>. No student shall be suspended for more than five school days without reasonable notice and a fair hearing. Specifically, Education Law § 3214(3)(c) gives the student and parent the right to a hearing, with the right to have an attorney or other advocate present. In addition to the notice required for a short-term suspension, the student and parent must be informed of

      a.  the opportunity for a hearing; and,

      b.  receive reasonable notice, including a description of the alleged misconduct such that it provides the student with enough information to prepare an effective and meaningful defense.

The school has the burden of establishing the misconduct occurred.

### *Chazy Central Rural School District Policies*

36.     CCRS has adopted a regulation governing the procedures for investigation and resolution of sexual harassment complaints. The School District Defendants violated their own policies in handling O.P.'s case.

37.     Under CCRS Policy 0110-R, the accused student and his parent must be provided with "an opportunity to respond to the charges in writing." O.P. was not given this opportunity.

38.     CCRS Policy 0110-R also requires that the investigation involve interviews of witnesses to the complaint. Prior to expelling O.P., neither Maziejka nor Principal Krista Ringer (Ringer) interviewed witnesses who would have offered exculpatory testimony confirming that O.P. did not sexually harass or assault CL.

39.     O.P. and his parents were also entitled to "review all documentation and information relevant to the complaint." O.P. was not provided any information to review prior to his expulsion, including the exculpatory video footage from the school bus.

40.     For complaints investigated by the principal, the Title IX Coordinator or the district Superintendent, the accused must be provided written notice of the outcome of the investigation. O.P. did not receive any written notice detailing the outcome of the investigation.

41.     CCRS policy 0110-R also guaranteed O.P. "the right to be represented by a person of [his] choice" during the sexual harassment investigation and related hearings. No one informed O.P. or his parents of this right.

### *Context for a Gender Biased Investigation*

42.     Owing to the renewed emphasis on victims' rights and the worry of a loss of federal funding if a school is not in compliance with Title IX, there is a nationwide trend favoring female student complainants over male student respondents accused of sexual misconduct.

43.    For example, in this case, the School District Defendants had already been rocked by a state court complaint filed against them alleging they had failed to protect a female student from sexual misconduct by another male student/classmate. This currently pending case, filed on November 11, 2022, in the New York Supreme Court, Clinton County, captioned *Jamie Pilon and Dennis Pilon, Individually and as Parents of A.P. v. Chazy Union Free School District, et al*., created significant news and upset in the local, rural school community.[3]

44.    The allegations against the School District defendants in the *Pilon* litigation humiliated and discredited the school administrators and in response the School District defendants took action. They sought to reclaim their reputation, authority and command by committing to a "get tough" approach to any female student's claim of sexual misconduct leveled against a male student. Specifically, Tim Howley, CCRS Board of Education member, stated that schools must "choose the girl no matter what" when a female student accuses a male student of sexual misconduct.

45.    Put simply, the community pressure and *Pilon* litigation resulted in defendants implementing a disciplinary investigation and process skewed against males.

## FACTUAL ALLEGATIONS

### *The Story of O.P.*

46.    O.P. (O.P.) was a determined, hard-working and vivacious 15-year-old when he died by his own hand on October 17, 2023, following a series of unlawful and wrongful events at school.

47.    The Poirier family operates a number of businesses in Clinton County, including a heating repair (HVAC) company, Rene's Repair, a retail heating supply store, Heatwave, several

---

[3]This case is hereinafter referred to as the *Pilon* litigation.

Poirier-branded True Value hardware stores, coin-operated laundromats, and rental properties. Both O.P. and his brother J.P. were fixtures at the family stores.

48.    From a young age O.P. enthusiastically participated in the family businesses when he was not in school or on the soccer field. O.P. worked in the hardware store running the register, stocking shelves, answering phones and cleaning the store. During school breaks and in the summer, O.P. worked with at Rene's Repair and was engaged in all manner of tasks. He most enjoyed working alongside the service technicians, installing and repairing HVAC systems.

49.    O.P. never shied away from hard work. He rose daily at 6:30, packed his lunch with a positive attitude when he headed to work with his father. At the end of the day, O.P. would excitedly tell his mother, Tammy Poirier, about the day's activities. He described crawling under homes, pulling boilers up the stairs, digging out sewer lines, and changing out toilets. O.P. was strong, enthusiastic with an exceptional work ethic. The service technicians, with whom O.P. worked, recognized his preternatural maturity and treated the 15-year-old O.P. as a young adult.

//

//

//

//

//

//

//

//

//

50.     In 2021, the Poirier family purchased property on which to build their dream home. O.P. was involved in every step of planning and process from the design of their home to the build. O.P. cut down trees, operated heavy equipment, dug out the basement, and set steel beams.



51.     Rarely would O.P. sit idle. He cared little for video games or television and much preferred to be active, useful, and productive. When he was not working in the family businesses, he and J.P. split wood together. In Summer 2023, they split 65 cords of wood together in the

evenings and on weekends. And when a neighboring horse farmer needed help moving hay bales, O.P. was there.

52.    O.P. and J.P. had an especially close fraternal bond. Typical moments of sibling rivalry quickly gave way to their shared love for each other. They supported and encouraged one another in work and their shared love for sports. This strong sibling relationship was a source of pride, inspiration and comfort for Tammy and Chad.



53.    O.P.'s family life was a well-balanced mix of work and fun. For as much as O.P. worked hard, there was no shortage of family fun time. The Poirier family regularly spent summers at the lake and took snowmobiling trips in the winter. Nothing was more important to O.P., J.P., Tammy or Chad than the time spent together. Whether it was the long-planned family vacation, the yearly sporting events or the prosaic activities of daily life, O.P. cherished time with family.



54.    Likewise, Tammy, Chad and J.P. treasured their time with O.P., whose life was cut short by a tragedy that hurts beyond measure—a tragedy that could have been avoided.

55.    O.P.'s second love was soccer. O.P. started playing at the age of four and it became the central part of his sporting life from then on. He played youth soccer throughout grade school and played year-round, both indoor and outdoor soccer. By age 13, O.P. qualified to play in a travel soccer league. He rarely missed a practice, a match or a tournament. He worked out religiously and in summers committed to extra early morning training sessions that began at 6:00 a.m., so he could get in some soccer training before his workday.



56.     O.P.'s affection for and commitment to soccer continued in high school. At 14 years-old, he was the youngest player on the Chazy School varsity team. He was a starting player on a team that went to the final four state championship and he went on to become a First Team All-Star in 2023. It was O.P.'s hope and plan to get to the state championship the following year, in 11th grade. O.P.'s team was well on its way as they had just won the league title on October 13, 2023, and were headed to the state championships. This was just three days before O.P.'s death.

57.     On Monday morning before O.P.'s tragic death, as he left home, he excitedly told his mother Tammy that he would let her know the playoff tournament schedule.

58.     O.P. was devoted to his team, his teammates, and his varsity coach Robert "Rob" McAuliffe. O.P. idolized McAuliffe and worked to make him proud both on and off the field. (McAuliffe was also CCRS Title IX Coordinator at the time.)[4]

59.     For as much as O.P. was a diligent worker and soccer star, he struggled with traditional classroom learning. He was diagnosed at an early age with dyslexia.

60.     Notwithstanding his learning disability, O.P. was immensely skilled with his hands. O.P. was thriving at CV-Tech, a vocational school where he focused on auto technology. He already had a keen understanding of motors after spending hours with Rene's Repair full-time mechanic.

61.     Indeed, O.P.'s interests, talents and work experience aligned perfectly with a degree in engineering. O.P. also talked about attending the specialized engineering program at State University of New York—Canton, just a few hours from home, where he could also continue to play soccer. Toward this end, O.P. planned on applying for admission to a specialized engineering

---

[4]Rob McAuliffe has since been promoted to Superintendent of CCRS. He is a named defendant in this case because as the current Superintendent he has the authority to grant the relief Plaintiff requests in Counts III and V.

program at CV Tech called, New Visions: Applied Engineering. O.P. knew this rigorous year-long program for select college-bound seniors, would aid in his college admissions and prepare him well for the college-level course work.

62.     Although O.P. was still years away from a college degree, he had the foresight and maturity to recognize that an engineering degree would be useful in his future role in the family business.

63.     O.P.'s parents, Chad and Tammy Poirier (collectively referred to as the "Poiriers") fully expected and planned for O.P. to step in their shoes and assume management and control of the family businesses. They firmly believed this because O.P. had already demonstrated a serious interest in the business and had developed the requisite work ethic. They also observed that O.P. had the acumen and people skills to be a competent and successful manager and leader. They had no doubt that O.P. would steer the family business into the future following their retirement.

64.     O.P.'s success and achievements are all the more remarkable given how his learning disability (dyslexia) caused him to struggle with traditional classroom learning. O.P.'s perseverance and diligence won out.

65.     At no time did O.P. ever present as depressed or suicidal. He reported to family and friends that he was happy and excited about upcoming life experiences, including the expected soccer championship he was to participate in. Nothing in his psychological or medical history presaged O.P.'s tragic suicide. O.P. was a healthy, psychologically stable, happy young man with a supportive, loving family.

66.     O.P.'s bright future was shattered when defendant Maziejka made the rash, reckless and wrongful decision to expel O.P. based on a false and unsubstantiated claim of sexual misconduct.

## A False Accusation, a Flawed Investigation, and an Erroneous Disciplinary Finding

### *O.P. and CL's Relationship*

67.     CL was the female student who made the false accusation of sexual misconduct against O.P.

68.     O.P. had known CL since they were preschoolers. They attended grade school together and reconnected at Chazy School. He was always friendly and kind toward CL.

69.     O.P. and his friends would engage in playful and innocent banter with CL. The daily CVTEC bus driver, Debbie Thomas, reported that the two sat together, side by side. They talked regularly and CL frequently brought O.P. food. Never did she see CL upset or distressed around O.P.

### *A Malicious False Accusation*

70.     On October 13, 2023, as typical, O.P., CL, CC, MA, and HK[5], among others, were traveling on the CCRS bus from Chazy School to their vocational classes at CVTEC.

71.     CCRS maintains video recordings of the daily bus rides.[6]

72.     The students were talking, taking photos and engaged in harmless, albeit chaotic play. CC and MA were at times kneeling on their seat and leaning over CL's seat. CL stood up and leaned forward and back at one point. O.P. remained seated the entire time. HK was glued to her phone the whole time but for a couple of times when she lifted her head up.

73.     O.P. playfully grabbed CL's books and in the same fashion, CC grabbed CL's phone. CC handed her phone to O.P., who took a photo of CL with CC and MA.

---

[5]We are using initials for the minor complainant (CL) and other minor witnesses to protect their privacy. CC and MA are male classmates, and HK is a female classmate and friend of CL.

[6]CCRS denied Chad and Tammy Poirier's request to view the videotape even though the evidence was used in connection with the decision to expel and even though O.P. was entitled under CCRS policy "to review all documentation and information relevant to the complaint."

74.    The students eventually arrived at CVTEC and exited the bus.

75.    The substitute bus driver on October 13, the day of the alleged assault, reported that he saw no troubling behavior during the morning bus ride.

76.    That night, following O.P.'s final regular season soccer game, Chazy School students, including CL and HK were waiting by the field for the soccer players. As the players, O.P. included, left the field to walk back to school, O.P. passed CL and HK without incident.

77.    Later that same night, CL and HK falsely reported to law enforcement authorities that O.P. had sexually assaulted CL on the bus earlier that same day. CL alleged that O.P. touched her crotch. Detective Bryan Caron began an investigation and took statements from CL and HK.

78.    Video footage of the students from the school bus did not support CL and HK's false accusations.

79.    Neither the Poiriers nor O.P. knew anything of the sexual misconduct accusation because no one informed them of the accusation or asked to speak with O.P. over the weekend.

***The Interim Superintendent Conducts a Flawed and Inadequate Investigation***

80.    On Monday morning, October 16, 2023, CL, her parents, her stepfather and HK appeared at Chazy School to meet with then-interim Superintendent Maziejka and Principal Ringer about CL's sexual assault allegation against O.P.

81.    Defendant Maziejka and Principal Ringer interviewed CL about her allegations. CL had the support and counsel of three parents during this interview process. HK was also present.

82.    Following this meeting, defendant Maziejka and/or Principal Ringer directed Rico Hernandez, who runs the school bus garage and handles dispatch for CCRS, to pull up videotape footage from the CVTEC bus rides that week. Hernandez was only able to recover the video from October 13, the day of the alleged assault.

83.     The three watched the video recording together. After viewing the video footage of O.P. and CL, Hernandez recalled defendant Maziejka stating, "If this were my son, I wouldn't be worried about it." Hernandez added that Maziejka did not see anything troubling or concerning on the video.

84.     That same Monday morning, October 16, O.P. went to school as any other day. After arriving at Chazy School, he boarded the school bus to CVTEC in Plattsburgh. Shortly after he arrived, defendant Maziejka and/or Ringer summoned him back to Chazy School. They directed Hernandez, who was also a substitute bus driver, to pick him up.

85.     No one from Chazy School or CCRS contacted O.P.'s parents for permission to transport O.P. back to Chazy School.

86.     O.P. had no understanding about why he was being called out of class and driven back to Chazy School and was told nothing. When O.P. expressed worry and concern that someone in his family had been hurt, Hernandez assured him that his family members were all fine.

87.     O.P. was taken to Principal Ringer's office where he met defendants Maziejka and Ringer. O.P. was baffled. O.P. told them he had no idea why he was there.

88.     Defendant Maziejka and Ringer then interrogated O.P. about CL's sexual assault allegation. O.P., a 15-year-old, was questioned at length, alone. He had no parent or support person during the questioning even though district policy and state and federal regulations guarantee this right. Without proper notice O.P. did not know that he had this right or that he could demand the presence of a support person and also seek the advice of counsel.

89.     O.P. was also not told of the allegation against him before Defendant Maziejka and Ringer began questioning him. Instead, it was only through O.P.'s interrogation that he learned that he had been accused of inappropriately touching CL.

90.     When asked if he had touched CL, O.P. acknowledged that he engaged in innocent, friendly play that involved touching CL's side with his pinky.

91.     O.P. stated he had asked CL whether she wanted him to stop the teasing play. She responded by laughing and did not ask him to stop. CL did not tell O.P. she was bothered by the poking or tickling and did not act as if it bothered her.

92.     O.P. soon realized the serious nature of the accusation leveled against him and became visibly distressed.

93.     As the interrogation continued, defendant Maziejka and/or Principal Ringer asked O.P. more precise questions about whether he touched CL sexually, on her bottom, over her genital area, or on her crotch. O.P. firmly denied touching her sexually or in any of those areas while "expressing strong emotions, including crying."

94.     O.P. was visibly distraught and distressed by the accusatory questioning and the false claim that he touched CL's genitals and continued to vehemently deny any inappropriate touching or sexual contact.

95.     Following the interrogation, and despite O.P.'s vigorous and repeated denials of wrongdoing, defendant Maziejka told O.P. that he was expelled and would no longer play soccer.

96.     Although O.P. was obviously distressed and traumatized by the questioning, the accusations, and Chazy School's abrupt decision to expel him. There is no indication that either defendant Maziejka or Principal Ringer said anything supportive or comforting to ease O.P.'s visible distress.

97.     After meeting with defendant Maziejka, O.P. sat with Ringer frightened and traumatized by what was happening. O.P. repeated his denials to Ringer, stating CL was "lying," "targeting" him, and making a claim for "attention." Although O.P. forcefully affirmed his

innocence, his denials made no difference. He had already been adjudged guilty and disciplined on the spot with expulsion. Utterly dejected and dismayed, O.P. said to Ringer, "This happened to [Dayton Rovers], I'm done." Dayton Rovers was the accused student in the harrowing *Pilon* litigation.

98.    Neither defendant Maziejka nor Ringer invited O.P.'s parents to be present for the investigative interview and interrogation he received. Rather, Tammy Poirier received a phone call from Maziejka at 10:17 a.m., *after* he had interrogated O.P.

99.    Defendant Maziejka called Tammy Poirier to tell her that O.P. had been expelled, and she needed to pick him up. Tammy was shocked. When she asked what had happened, Maziejka stated only that O.P. was accused of sexual misconduct on the bus.

100.    When the Poiriers arrived at Chazy School they found O.P. distraught and inconsolable. O.P. had his head on the table and was sobbing and hyperventilating. O.P. continued to deny the sexual assault allegation.

101.    The Poiriers recall Maziejka told them on their arrival that O.P. had been accused of touching a girl's crotch. O.P. immediately interjected with a denial of wrongdoing. "I didn't do this," he said.

102.    With no regard for the visible anguish O.P. was experiencing, Maziejka then repeated how O.P. had been accused of touching a girl's crotch. He then said, "we take these matters very seriously" and added that there was an ongoing criminal investigation against O.P. which only served to cause the Poiriers and O.P. further severe distress.

103.    When neither O.P. nor the Poiriers responded to Maziejka's comments regarding CL's allegations. Maziejka essentially repeated this information for a third time. In response, Tammy Poirier asked Maziejka, "Does that mean we are returning for an investigator to speak

with him?" Maziejka responded, "It has nothing to do with us. O.P. is being expelled. You will deal with that [the criminal investigation] alone."

104.    O.P. and the Poiriers then drove home where O.P. expressed, among other things, fear and shame that he was now expelled and would be barred from continuing to play soccer. He was also distressed about having to tell Coach McAuliffe about his expulsion. O.P. expressed dismay in having let down his soccer team and Coach McAuliffe. O.P. made statements, such as: "If they lose these [playoff/championship] games, it will be my fault."

105.    Although Principal Ringer's notes allege O.P. and the Poiriers were told O.P. was "suspended" for "the remainder of the week," this statement is false. O.P. and the Poiriers were told O.P. was expelled. They were not informed that there was any chance of O.P. returning to school as a student. Had this information been provided to O.P., he would not, among other things, have expressed such hopelessness or deep dismay over letting the soccer team down by being unable to play in the upcoming playoff/championship games.

106.    The unwarranted decision to expel O.P. (which included permanent dismissal from the Chazy School soccer team), Maziejka's misleading and callous statements to O.P. and his mother, and defendants' complete disregard of its policies led directly to O.P.'s tragic death. His expulsion created substantial and overwhelming anguish, grief and distress and resulted in his suicide just hours later.

107.    Notably, Neither defendant Maziejka nor Principal Ringer told the Poiriers that O.P. had expressed verbally his hopelessness and despair with the situation. No one told them he had said, "I'm done," which school officials knew to be a warning sign that O.P. was at risk for imminent suicidal behavior.

108.    Defendants are trained to identify the risk factors for suicide, which include feelings of hopelessness, worthlessness and despair about the future. This training includes, but is not limited publications such as *A Guide for Suicide Prevention in New York Schools* which warns that "Stressful life events or situations can serve as triggering events for suicidal behavior."[7] *A Guide for Suicide Prevention in New York Schools* at 6. These triggering events include getting in trouble in school and "[r]eal or perceived losses, and upcoming events for which a student feels unprepared and overwhelmed, can also be precipitating events." *Id*.

109.    Warning signs of suicide include "observable signals that tell [school staff] to stop and pay immediate attention to a particular student because they may be at risk for imminent suicidal behavior." *Id.*   These signals included statements such as O.P.'s "I am done" statement. Yet, neither Maziejka nor Ringer told the Poiriers what O.P. had said, nor did they inform him that these factors taken together put O.P. at risk for suicide. Since defendants purposely held the meeting in the absence of O.P.'s parents, O.P.'s parents could not have known how deeply the news affected their son unless defendants had informed them. Had defendants done so, O.P. would still be alive because the Poiriers would have done what defendants failed to do—safeguard O.P.'s mental wellbeing and ward off any suicide risk.

110.    In the wake of the emotionally disturbing news of his expulsion, O.P. displayed the warning signs of a student demonstrating acute suicide risk, yet no one alerted O.P.'s parents that this distressing and triggering life-changing event (resulting from defendants' own recklessness and wrongful conduct) put O.P. at risk for suicide. Had they been told, O.P.'s death would have been prevented.

---

[7]A copy of *A Guide for Suicide Prevention in New York Schools* can be found at https://www.preventsuicideny.org/wp-content/uploads/2022/12/SchoolsSuicidePreventionGuide.pdf  (last accessed on January 2, 2025).

### *Evidence Contradicted CL's Allegations of Sexual Misconduct*

111.    Defendant Maziejka's decision finding O.P. responsible for sexual assault was not supported by the evidence.

112.    The Poiriers learned weeks after their son's death about what transpired on the bus ride that day from Detective Bryan Caron, who personally reviewed the video recording of the bus ride.

113.    Detective Caron told Chad Poirier that the video recording showed there was nothing wrong taking place on the bus. In other words, the video recording does not support CL's allegation of sexual assault.

114.    The video footage from the bus refutes CL's allegation of sexual assault. According to Detective Caron, as noted above in paragraphs 72-73, CL was happily engaged in horseplay with the other students. At no time did her demeanor suggest she was uncomfortable or distressed. In fact, CL was engaged in playful conduct which included picture taking and horsing around.

115.    Detective Caron told Chad that had CL been touched inappropriately her demeanor would have changed, she would have jumped, moved about or yelled. Detective Caron stated that there was none of that.

116.    Rico Hernandez, who reviewed the video recording with Maziejka, also confirmed there was no evidence of wrongdoing on the video recording. Just days after O.P.'s passing, he said to Tammy Poirier, "Tammy, you need to know, I watched the tape, and nothing happened."[8]

117.    Likewise, defendant Maziejka's own assessment of the video recording does not support a finding of sexual assault.

---

[8]Rico Hernandez disbelieved the accusations against O.P. even though he has known CL her whole life. Hernandez's adult daughter is CL's half-sister. Despite this familial connection to CL, Hernandez doubted the veracity of the malicious claims against O.P.

118.    Defendant Maziejka and Principal Ringer prepared an "Investigative Timeline" reporting that O.P. reached across toward CL but she "did not appear visibly upset" nor did she "attempt to move away." And throughout the bus ride, the two "continued to appear as good friends, engaging in conversation and sharing lunch."

119.    Later that day, after O.P.'s expulsion, Principal Ringer interviewed CC and MA about the October 13 bus ride because the video showed them involved in carousing and horseplay with CL. Their testimony corroborated O.P.'s statements and denials of wrongdoing.

120.    When asked what happened on the bus, CC responded that while they had been fooling around, joking, laughing and messing with the seat belts, nothing out of the ordinary happened. In other words, nothing untoward had occurred.

121.    More specifically, CC, who was there the whole time, reported that nothing sexual occurred. He saw nothing more than O.P. poking CL in the ribs over her clothes, which merely reciprocated her actions toward O.P.

122.    Four weeks after the alleged assault and long after the decision to expel O.P., on November 14, 2023, Principal Ringer and an unidentified person interviewed Dennis Pilon, the bus driver on the day of the alleged assault. Asked whether he observed anything inappropriate between O.P. and CL, Pilon responded, "I did not observe anything from either student or anyone else on the bus that caused me concern. I have a lawsuit against the school and if I saw behavior that was inappropriate, I would have stopped it and then reported it."[9]

123.    Here, Defendant Maziejka and Principal Ringer wrongfully and maliciously expelled O.P. because they disregarded other evidence pointing to the falsity of CL's allegation.

---

[9]Dennis and Jamie Pilon have, on behalf of their daughter, sued defendants alleging in part negligence, negligent supervision and breach of the statutory duty to report the sexual assault of their daughter, a Chazy Central Rural School student. This is the *Pilon* litigation.

For example, Defendant Maziejka and Principal Ringer obtained a statement from a CVTEC staffer, Michelle Friedman, who had spoken with HK about the allegations. Yet Maziejka and Ringer knew HK's testimony was objectively false based on their review of the video footage from the bus ride and other facts known to them.

124.    For instance, HK reported that starting on Tuesday, October 10, O.P. was "touching [CL] everywhere." She added, it got "worse as the days went on." According to Friedman, HK claimed there was touching on the "[b]utt, belly, mid-leg, crotch area." And it was at its worst on Friday, October 13, when "[CL] kept trying to get away from him."

125.    None of HK's testimony was true. The video recording of the Friday bus ride, which Maziejka and Principal Ringer watched, directly refuted HK's statements. As noted in defendant Maziejka and Principal Ringer's "Investigative Timeline," CL "did not appear visibly upset" nor did she "attempt to move away." Accordingly, her testimony was not to be trusted.

126.    Secondly, HK also reported that CL tried twice to talk with Principal Ringer to report the alleged sexual misconduct, but Ringer was unavailable. Here too HK is untruthful. In fact, as recorded in the "Investigative Timeline," CL met with Ringer on Thursday, October 12, at which time she "expressed her present contentment with school."

127.    If it were true that CL had twice endeavored to report O.P., she would have said something right then and there. That CL met with Principal Ringer on Thursday and said nothing disproved HK's allegation that she and CL had tried to report O.P.

128.    Thirdly, HK was in no position to report on what was happening between O.P., CL, CC and MA because she was "glued to her phone" during the bus ride. As previously noted (in paragraph 72), she only lifted her head twice during that time, which is to say, she saw nothing.

129.    Lastly, defendant Maziejka and Principal Ringer had even more reason to discount HK's statements and question the allegation against O.P. On information and belief, HK sought to injure O.P. by spreading CL's false allegations against him.  Information supporting this belief, includes but is not limited to HK's claim to be standing up for CL, and HK's statement  that she was "acting as [CL's] voice." But if HK is to be believed, when the alleged assault was taking place, she just sat by and did nothing. If O.P. had been assaulting CL, HK would have said something or tried to put a stop to it while it was happening.

130.    HK's malicious statements were objectively implausible and should have been discredited.

131.    Taken together, the evidence did not support a finding that O.P. had engaged in sexual misconduct.

132.    It was HK's objective to persecute O.P. because he was popular, well liked, had money and was from a prominent family in the community. HK was heard to say, "I am going to destroy O.P.'s life."

//

//

//

## A Biased Investigation and Erroneous Disciplinary Finding

133.    Defendant Maziejka and Principal Ringer conducted a biased, flawed investigation in violation of O.P.'s federal and state rights. Owing to the rush to judgment and summary discipline without due process, O.P. had no opportunity to present a defense.

134.    O.P. received no written notice of the allegations nor was he informed of his Title IX rights as the respondent in a Title IX complaint.

135.    O.P. was also deprived of the protective supportive measures to which he was entitled by law.

136.    O.P. was denied an impartial, neutral factfinder. Instead, defendant Maziejka acted as investigator, prosecutor and judge.

137.    Before any suspension or discipline, O.P. *and* his parents should have been afforded the opportunity for a conference to present his version of events and to ask questions of CL, the complaining witness. This failure violated state and federal statutes and regulations and/or local school district policies.

138.    O.P. was also deprived of a fair hearing with the right to representation by counsel, the right to question witnesses, and the right to present witnesses on his behalf. O.P. was summarily expelled with no process whatsoever.

139.    After O.P.'s repeated and consistent denial of misconduct, defendants were obligated to provide O.P. with an explanation of the basis for his discipline. They did not. This failure violated state and federal statutes and regulations and/or local school district policies.

140.    The defendants unfairly disregarded O.P.'s credible, consistent and corroborated testimony and assumed CL's veracity when the evidence showed otherwise. For example:

　　a. O.P. was honest about engaging in innocent horseplay with CL and repeatedly and emphatically denied any inappropriate touching.

　　b. The video footage from the bus showed no evidence of inappropriate touching, and corroborated O.P.'s testimony that CL was not upset or bothered at any time during the bus ride: "O.P. and CL continued to appear as good friends, engaging in conversation and sharing lunch."

　　c. CC and MA stated there was no improper touching.

　　d. The bus driver saw no inappropriate conduct between O.P. and CL.

141. The false allegations made against O.P. were malicious and harmful. Malicious allegations of sexual harassment are a form of sex discrimination. *See, e.g.*, *Schiebel v. Schoharie Central School Dist., et al.*, 120 F.4th 1082, 1097-98 (2d Cir. 2024).[10] The evidence gathered and reviewed by Maziejka and Principal Ringer suggested that the accusation against O.P. was fabricated, untrue and inherently malicious.

142. Defendant Maziejka and Principal Ringer effectively shut their eyes to "the risk that [they] were imposing sanctions based on a malicious, and therefore discriminatory accusation." *Id.*

143. Further, defendant Maziejka's questioning of O.P. manifested a predetermined belief in CL's veracity. For, as the Poiriers later learned, the *Pilon* litigation caused the School District Defendants to commit to discipline harshly male students accused of sexual misconduct in response the Pilons' allegations that female students were not being properly protected from male students.

144. Defendants' gender bias led to a sham investigation and resulted in an erroneous outcome—an outcome that barred O.P. from participating in CCRS educational programs and extracurricular activities—and ultimately caused O.P. to believe he had no other option than to take his own life.

145. The unlawful discrimination by the defendants in violation of Title IX proximately caused O.P. to sustain death and other substantial injuries, and damages, including mental anguish, severe emotional distress, injury to reputation, future economic loss.

---

[10] "The malicious accuser's sex-based discriminatory 'intent may be imputed to [the recipient school]' when the recipient 'controlled . . . the very complaint process by which she sought to effectuate her allegedly discriminatory intent' and the recipient effectively 'implemented' the accuser's 'discriminatory design.'" *Schoharie Central School Dist., et al.*, 120 F.4th 1082, 1097 (2d Cir. 2024) (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 39  (2d Cir. 2019).

146.    Had O.P. been given his rights, had he received proper notice; had he been given the support of his parents (as he was entitled to) during his interrogation; and, had there been an unbiased impartial investigation and decisionmaker, O.P. would not have been wrongfully disciplined. In sum, had proper procedures been followed, O.P. would have been found "not responsible" and he would still be alive today.

147.    Instead, O.P. was hastily interrogated alone, improvidently adjudged guilty and summarily expelled. This summary and unlawful action left O.P. traumatized, ashamed and hopeless.[11]

## COUNT I
## Title IX—Gender Discrimination/Disparate Treatment
### (against School District defendants)

148.    O.P. repeats and realleges each and every allegation from the paragraphs above as if fully set forth herein.

149.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

150.    To establish Title IX liability, O.P. must allege a plausible inference that defendants discriminated against him on the basis of his gender.

151.    Here, defendants conducted an inadequate, gender biased and unfair investigation, which resulted in the erroneous determination that O.P. was guilty of sexual harassment.

---

[11]O.P. had seen what the male accused student in the *Pilon* litigation, Dayton Rovers, had experienced after facing a claim of sexual assault. Rovers was stigmatized, branded and forced the change schools. Rovers' sister was bullied, and his mother, who had been a teacher in the Chazy Central Rural School District for more than 20 years, had to quit. O.P. foresaw the same happening to him and his family after his expulsion.

152.    Defendants were deliberately indifferent to the discrimination their sham investigation inflicted on O.P.

153.    Defendants did not allow for a hearing, which resulted in the gender-biased determination that O.P. was responsible for inappropriate sexual touching.

154.    Defendant Maziejka and Principal Ringer's biased interview of O.P. was rendered meaningless by the failure to give him notice, by the absence of his parents, and by the failure to allow him time to present his defense with corroborating witnesses.

155.    Defendants were intent on sending a message to the community that they are tough on males accused of sexual misconduct.

156.    Defendants treated O.P. differently based on his sex and in so doing also deprived him of fundamental due process.

157.    In the wake of the *Pilon* litigation, defendants made the decision to side with the accusing female in cases of alleged sexual harassment. For instance, in referencing issues related to the *Pilon* litigation, CCRS Board of Education member Tim Howley stated the CCRS Board of Education must "choose the girl no matter what."

158.    Likewise, at the time O.P. was falsely accused of sexually harassing CL, there was a consensus in the community that defendants had mishandled the *Pilon* case and that defendants were under pressure to show the community at large that they are serious about addressing female students' allegations of sexual harassment. Hence, defendants had a motive to discriminate against O.P. to demonstrate their commitment to protecting female students from male sexual assailants.

159.    The sanction imposed on O.P. was not the result of a bona fide, good faith investigation. Rather, it resulted from sex-based bias—this was the motivating factor in defendants' decision to discipline O.P.

160.    Where, as here, there are procedural irregularities, including the failure to follow the school district's own grievance polices or applicable Title IX regulations, there is probative evidence of gender based deliberate indifference. *Scheibel*, 120 F.4th 1082, 1095 (2d Cir. 2024).

161.    Indeed, the response to the allegation of sex harassment against O.P. followed by the impetuous, reckless, and biased decision to expel O.P. on the spot was "'clearly unreasonable' in light of known circumstances." *Id.* at 1094-95. Accordingly, Defendants' conduct qualifies as deliberately indifferent.

162.    For instance, as shown above, defendant Maziejka was deliberately indifferent to the truth or falsity of the accusation against O.P. (*See* ¶¶ paragraphs 111-132). In this regard, the grievance process was objectively deficient and was not aimed at uncovering the truth.  *Scheibel*, 120 F.4th at 1097.

163.    Likewise, defendants' bias against males, manifested in part in defendant Maziejka ignoring and/or turning a blind eye to facts and details pointing to the falsity or implausibility of CL's accusation, "imposed sanctions under circumstances that indicate  deliberate indifference to the truth or falsity of the accusation." *Id*.

164.    The manner in which Defendants administered the disciplinary proceeding against O.P. also reflected a sex-based bias.

165.    For example, unlike CL, O.P. was interrogated alone without a single support person, guardian or parent. And when O.P. became visibly distressed, shortly after his interview began, at no time did defendant Maziejka or Principal Ringer pause the interview to await the arrival of his parents.

166.    In contrast, when CL was interviewed, she had the compassionate support and counsel of three parents (her father, mother and stepfather) and a friend.

167.    CL's friend, HK, a self-proclaimed witness to the alleged assault also sat in on her interview. The presence of HK compromised CL's testimony.

168.    Further, defendant Maziejka and Principal Ringer obtained testimony from CL's witness as part of its investigation but did not obtain testimony from O.P.'s witnesses. Rather, Maziejka decided O.P.'s guilt and sanctioned him before ever hearing from his witnesses. Only after O.P. was expelled did defendants endeavor to speak with other witnesses. In this regard as well the process was "so 'objectively deficient' that it cannot be said to have aimed at uncovering the truth." *Scheibel*, 120 F.4th 1082, 1095 (2d Cir. 2024).

169.    When further statements were obtained following O.P.'s expulsion, this testimony corroborated O.P.'s denial of wrongdoing and affirmed the conclusions drawn from the initial review of the video footage. But by then it was too late. Defendant Maziejka had already wrongly expelled O.P., which caused him to feel he had no other option but to end his own life.

170.    Other CCRS employees recognized and acknowledged the gross mishandling of the sexual misconduct complaint against O.P. For example, at the time of O.P.'s October 16, 2023 interrogation, then-CCRS soccer coach/Title IX Coordinator McAuliffe, was out of town for personal reasons.

171.    Chad Poirier had explained to McAuliffe what had happened to O.P. in his absence and recounted to McAuliffe the events and circumstances leading up to O.P.'s suicide. McAuliffe was unavailable to address the sexual harassment claim against O.P. because he was out of town for personal reasons on the day Chazy School took up CL's complaint.

172.    Notably, McAuliffe (who was CCRS Title IX Coordinator at the time of O.P.'s death) told Chad Poirier that had he been present at CCRS on October 16, he would have

"personally handled the matter" and would have "managed CL's sexual assault allegations differently" such that it would not have resulted in O.P.'s death, and he would still be alive today.

## COUNT II
### Procedural Due Process Violation
### Fourteenth Amendment, 42 U.S.C. § 1983
(against defendant Maziejka individually)

173.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

174.    Plaintiff seeks to hold Maziejka liable in his "individual capacity." Following *Goss v. Lopez*, 419 U.S. 565 (1975), the United States Supreme Court held that a disciplinary suspension (or expulsion) without a hearing is unconstitutional. *Goss* established that a student cannot be deprived his right to a public education on grounds of misconduct absent fundamentally fair procedures to determine whether the misconduct occurred. *Id.* at 574. This right is *clearly established* after *Goss* and defendant Maziejka knew or had reason to know his actions violated the Fourteenth Amendment.

175.    Maziejka's determination of O.P.'s guilt was fundamentally flawed. It stems from a process that deprived O.P. basic due process rights guaranteed by the U.S. Constitution and by Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, *et seq.* and its implementing regulations.

176.    As guaranteed by the United States Constitution, O.P. was entitled to a meaningful opportunity to be heard and a process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he faced.

177.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." In this case, defendant Maziejka was then a state actor subject to the Fourteenth Amendment.

178.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress.

179.    The U.S. Department of Justice codified the minimum due process accused students

are entitled to in disciplinary proceedings. The Department of Education's Office of Civil Rights

adopted formal, enforceable regulations designed to "achieve fairness and reliable outcomes" by

requiring necessary due process protections—protections that O.P. did not have during his sham

disciplinary proceeding. These policies and protections include, but are not limited to:

- *Presumption of innocence*. A presumption that the respondent is
  not responsible for the alleged conduct until a determination
  regarding responsibility is made;
- *Written notice*. A written description of the specific facts
  involved in the complaint and the time when the alleged
  wrongdoing occurred;
- *Supportive measures*. The right to have an advisor present at all
  investigation-related meetings;
- *Notice of right to present witnesses.* The right to name and
  present supporting witnesses; and/or
- *Written investigation report.* A written report summarizing the
  investigation, the evidence and detailing the basis for any
  disciplinary action.

180.    Defendant Maziejka violated these requirements because O.P. received none of

these protections. Although defendant Maziejka and Principal Ringer interviewed CL and O.P.,

and took steps toward an investigation, the few hours spent inquiring about the allegations were

inadequate to meet the standards required by law. The procedures implemented, presumed O.P.'s

guilt, impaired the search for truth and thereby violated fundamental tenets of due process.

181.    As detailed in this Complaint, the defendants unlawfully and erroneously expelled O.P. based on a flawed biased proceeding based on a predetermined outcome and lacking the quantum of evidence needed to make a finding of sexual assault.

182.    Defendants' investigation and interview of O.P. did not meet the standard for a fair hearing under the United States Constitution. "To satisfy the Due Process Clause, 'a hearing must be a real one, not a sham or pretense.'" *Doe v. Purdue University*, 928 F.3d 652, 663 (7th Cir. 2019) (quoting *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 629 (7th Cir. 2006)). *Accord Scheibel*, 120 F.4th at 1095 (observing that "a 'wholesale failure to employ established procedures for investigating sexual harassment complaints might establish [the process is a sham]").

183.    On information and belief, defendant Maziejka only heard competing testimony from CL and O.P., and on this alone determined O.P. was responsible. He also ignored objective, exculpatory video evidence that refuted CL's accusation of assault.

184.    Further, it was only *after* defendant Maziejka found O.P. responsible and disciplined him with expulsion that Principal Ringer interviewed other witnesses, namely, CC and MA, who then provided further exculpatory evidence.

185.    O.P. was irreparably damaged by defendants' violation of his due process rights. Had he been granted the rights to which he was entitled, he would not have been summarily expelled, without proper notice and meaningful hearing, and O.P. would still be alive today.

186.    But for  defendants' violation of O.P.'s due process rights, O.P. would not have suffered the distress and mental anguish occasioned by the belief that he was barred from returning to Chazy School and would forever bear the shame and indignity in his closeknit, rural community of having been found responsible for sexual assault and banned from the sport he loved.

187.    O.P. was living a vibrant, joyful and industrious life until it was all upended by a malicious, false allegation—an allegation that was handled through a hasty, biased, sham investigation and followed by an erroneous disciplinary action.

188.    Defendant Maziejka punished O.P. under a process that failed to satisfy the minimum standards of fairness required by the Due Process Clause.

189.    But for Maziejka's unlawful and reckless actions, O.P. would still be alive.

190.    In conclusion, defendant Maziejka violated the U.S. Constitution by depriving O.P.'s requisite due process to reach a preordained result.

### COUNT III
### Declaratory Judgment for Procedural Due Process Violation
### Fourteenth Amendment, 42 U.S.C. § 1983
(against defendant McAuliffe)

191.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

192.    The Fourteenth Amendment of the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law."

193.    The Due Process Clause of the United States Constitution is implicated by secondary school disciplinary decisions, including the disciplinary decisions under School District policies.

194.    The School District defendants were required to provide O.P. with a meaningful opportunity to be heard and a process commensurate with the seriousness of the allegations, the potential discipline, sanctions and repercussions he faced.

195.    The School District defendants violated O.P.'s rights under federal law and O.P. has been severely damaged. His life was destroyed, and his reputation is irrevocably tarnished without proper redress.

196.    O.P., through his estate, is entitled to an opportunity to clear his name and correct

the unfair and erroneous outcome from the sham investigation and disciplinary sanction.

197.    Accordingly, Plaintiff requests, under 28 U.S.C. § 2201, a declaration requiring the defendants to conduct a new disciplinary proceeding free of the constitutional violations cited in this Complaint.[12]

### COUNT IV
### Denial of Equal Protection Based on Sex
### Fourteenth Amendment, 42 U.S.C. § 1983
(against defendant Maziejka individually)

198.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

199.    The Fourteenth Amendment to the United States Constitution provides in relevant part:

---

[12]Because there is no requirement that an accused respondent provide testimony in a Title IX hearing, O.P.'s unavailability is no bar to a new hearing. When conducting a new hearing CCRS can rely on O.P.'s prior recorded statements (which contain O.P.'s firm denials of wrongdoing) and provide a new hearing that meets all requirements under the law.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

200.    The preceding allegations of unconstitutional gender bias and sex discrimination (as detailed in paragraphs 80-101, 133-147, 148-172, and elsewhere in this Complaint) support the claim that defendant Maziejka violated O.P.'s rights guaranteed by the Fourteenth Amendment of the U.S. Constitution, and therefore, 42 U.S.C. § 1983.

201.    Defendant Maziejka, acting under color of state law, deprived O.P. of the rights, privileges and immunities secured by the Equal Protection Clause of the Fourteenth Amendment such that without justification, they intentionally discriminated against O.P. on the basis of his sex.

202.    Defendant Maziejka exhibited a sex-based bias when he administered the disciplinary proceeding and chose to believe CL because she is a female and chose to disbelieve O.P. because he was a male.

203.    As alleged above, the School District defendants and defendant Maziejka had a motive to discriminate against O.P. They sought to show the community at large that they are tough on males accused of sexual harassment. It was all the more important that they demonstrate their commitment to protecting female students from male sexual assailants owing to the public pressure and embarrassment defendants faced owing to the pending *Pilon* litigation. *See Scheibel*, 120 F.4th at 1096 (citing *Menaker v. Hofstra Univ.*, 935 F.3d 30, 32 (2d Cir. 2019)).

204.    The School District defendants and defendant Maziejka sought to avoid other potential litigation against them from female accusers. The quick, summary discipline imposed on O.P. served this purpose.

205.    The discipline on O.P. was erroneously and selectively imposed and was thus

discriminatory.

206.    Defendant Maziejka's violations of the Equal Protection Clause proximately caused O.P. to suffer severe injuries, including emotional distress and death.

207.    As a result of the foregoing, O.P.'s estate has been damaged in an amount to be determined at trial.

**COUNT V**
**Denial of Equal Protection Based on Sex**
**Fourteenth Amendment, 42 U.S.C. § 1983**
(against defendant McAuliffe)

208.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

209.    Defendants' violations of the Equal Protection Clause proximately caused O.P. to suffer severe injuries, including emotional distress and death.

210.    The preceding allegations of unconstitutional gender bias and sex discrimination (as detailed in paragraphs 80-101, 133-147, 148-172, and elsewhere in this Complaint) support the claim that O.P. was deprived his rights guaranteed by the Fourteenth Amendment of the U.S. Constitution, and therefore, 42 U.S.C. § 1983 and is entitled to injunctive relief.

211.    As alleged above, the School District defendants had a motive to discriminate against O.P. They sought to show the community at large that they are tough on males accused of sexual harassment.

212.    O.P., through his estate, is entitled to a declaration under 28 U.S.C. § 2201, that defendants' policies as applied to him violated the Fourteenth Amendment. Defendants must also be ordered to provide a new disciplinary proceeding free from the bias and the constitutional violations addressed in this Complaint.

**COUNT VI**
**WRONGFUL DEATH**

(against School District defendants and defendant Maziejka)

213.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

214.    On October 17, 2023, O.P. died a wrongful death owing to defendants' negligence, wrongful acts and omissions and their violation of state and federal rights, statutes,  and regulations and/or the failure to follow school district policies.

215.    Defendants' deliberate, reckless and/or negligent acts described above, both individually and in concert, were the proximate cause of O.P.'s undue stress, anguish, anxiety, embarrassment, humiliation and his decision to commit suicide.

216.    The defendants' conduct, as described above, created an unreasonable risk of causing O.P. mental anguish and emotional distress. But for defendants' actions, O.P. would still be alive.

217.    O.P.'s mental anguish and emotional distress (which was in evidence during his traumatic interview) was foreseeable.

218.    O.P.'s mental anguish and emotional distress was severe enough that it resulted in illness, bodily harm and death.

219.    As a result of defendants' actions described above, O.P. sustained substantial injury, damage and loss, including but not limited to, mental anguish, severe emotional distress, and death.

220.    As a result of defendants' actions described above, the distributees and next of kin under O.P.'s estate have sustained damages in an amount that exceeds the jurisdictional limits of this Court.

## COUNT VII
## ABUSE OF PROCESS
(against School District defendants and defendant Maziejka)

221.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

222.    Defendants wrongful use of the disciplinary proceedings also amount to an abuse of process for which they are liable. An abuse of process claim requires (1) a regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective. *D'Amico v. Correctional Medical Care, Inc*., 120 A.D.3d 956, 960, 991 N.Y.S.2d 687, 692 (2014).

223.    NY Education Law § 3614 and Title IX provide specific civil/administrative rules (i.e., processes) for addressing complaints of sexual harassment in educational settings.

224.    Defendants harmed O.P. by failing to provide him with the process to which he was entitled. There was no excuse or justification for the abrogation of O.P.'s rights.

225.    As alleged above, defendants used the process in a perverted manner to obtain a collateral objective, to show the community at large that defendants were tough on males accused of sexual assault.

226.    Defendants ignored evidence obtained in the process evidence showing that O.P. was falsely accused because they needed to show they treat claims of sexual harassment by female students seriously. Defendants also used this process to gain advantage in the pending *Pilon* litigation wherein defendants have been accused of failing to protect female students. In other words, defendants perverted the process by taking harsh disciplinary action against O.P. to show that claims of deliberate indifference in the *Pilon* litigation are meritless.

227.    O.P. has suffered actual damages owing to defendants' abuse of process. He suffered mental anguish, severe emotional distress and death.

**WHEREFORE**, plaintiff requests that judgment be entered against defendants in its

favor and prays for relief as follows:

### As to Counts I, III and V

    (a) a declaration under 28 U.S.C. § 2201 directing the School District defendants to vacate the outcome of the legally flawed investigation and disciplinary process, and/or

    (b) a declaration under 28 U.S.C. § 2201 requiring the School District defendants to provide a new disciplinary proceeding free of the state federal and constitutional violations addressed in this Complaint, and enjoining defendants from subjecting O.P. (through his estate) to further proceedings tainted by the procedural and constitutional violations addressed herein;

### As to Counts I, II, IV, VI and VII

    (c) an order granting compensatory damages in an amount to be determined at trial;

    (d) an order awarding plaintiff pre-judgment and post-judgment interest;

    (e) an order awarding plaintiff costs and expenses, including reasonable attorneys' fees incurred in this action;

    (f) such other and further relief as this Court finds just and equitable.

DATED this __28th___ day of February 2025.

BAILEY, JOHNSON & PECK

_____

John W. Bailey
Bar Roll No.: 101069
5 Pine West Plaza, Suite 507
Albany, NY 12205
(518) 456-0082
jwbailey@baileyjohnson.com

OFFIT KURMAN

_____

Kimberly C. Lau
(to be admitted pro hac vice)
590 Madison Ave.
New York, NY 10022
(347) 589-8549
Kimberly.lau@offitkurman.com

ROSENBERG & BALL CO. LPA

_____

Eric J. Rosenberg
(to be admitted pro hac vice)
205 S. Prospect Street
Granville, Ohio 43023
(740) 644-1027
erosenberg@rosenbergball.com

## VERIFICATION

STATE OF NEW YORK         :

                                   : SS

CLINTON COUNTY           :

       I, <u>Chad Poirier</u>, after being first duly sworn, depose and state that I am the duly appointed administrator of the Estate of Owen Poirier. I was also Owen's father and guardian at the time of his death. I have read the foregoing Verified Complaint and attest that this verification is upon my own knowledge, information and belief. I believe the allegations in the foregoing Complaint to be true to the best of my knowledge, information and belief.

                                                                    Chad Poirier

This Verification has been sworn to before me and subscribed in my presence this ___6___ day of February 2025 after receiving Chad Poiriers identification.

                                 Notary Public

                                           SUSAN DECLARIO
                           NOTARY PUBLIC, STATE OF NEW YORK
                             Registration No. 01DE6376404
                                 Qualified in Clinton County
                         Commission Expires June 11, 2026